1

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

2

Ramzi Abadou (Bar No. 222567)

3

580 California Street, Suite 1750
San Francisco, CA 94104

4

Telephone: (415) 400-3000
Facsimile: (415) 400-3001

5

rabadou@ktmc.com

6

*Counsel for Plaintiff*

7

*[Additional counsel listed on signature page]*

8

9

10

**UNITED STATES DISTRICT COURT**

11

**EASTERN DISTRICT OF CALIFORNIA**

12

13

| | |
|---|---|
| Ahmad Ranjha, individually and on behalf of all others similarly situated, | ) Civil Action No.: |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **CLASS ACTION COMPLAINT** |
| | ) |
| WACHOVIA BANK, N.A. WACHOVIA MORTGAGE CORPORATION, WACHOVIA RE, INC., (and their successors and assigns) UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY, PMI MORTGAGE INSURANCE COMPANY, MORTGAGE GUARANTY INSURANCE CORPORATION, GENWORTH MORTGAGE INSURANCE CORPORATION, AND REPUBLIC MORTGAGE INSURANCE COMPANY, | ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.       Defendants Wachovia Bank, N.A, ("Wachovia Bank") Wachovia Mortgage Corporation ("Wachovia Mortgage"), together with their affiliated reinsurer, Wachovia RE, Inc.. ("Wachovia RE") (collectively, "Wachovia"), have acted in concert with Defendants United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co., Mortgage Guaranty Insurance Co., Genworth Mortgage Insurance Corp., and Republic Mortgage Insurance Co. (collectively, the "Private Mortgage Insurers") (together with Wachovia, "Defendants") to effectuate a captive reinsurance scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums were paid by the Private Mortgage Insurers to Wachovia RE; and (b) Wachovia RE received an unlawful split of private mortgage insurance premiums paid by the Private Mortgage Insurers' customers referred by Wachovia entities.

2.       This is a proposed nationwide action brought by Plaintiff Ahmad Ranjha ("Plaintiff") on behalf of himself and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Wachovia Bank and/or Wachovia Mortgage or any of their subsidiaries and/or affiliates between July 5, 2005, and the present (the "Class Period")[1] and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Wachovia's captive mortgage reinsurance arrangements (hereinafter, the "Class").

3.       Captive reinsurance schemes, such as the scheme involving Defendants described herein, have been widespread throughout the mortgage lending marketplace.  As *American Banker* magazine recently reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately

---

[1]       Plaintiff reserves the right to seek modification of the Class Period definition in the event that further investigation/discovery reveals a more appropriate and broader time period, as examination of the Private Mortgage Insurers filings with the NAIC indicate that they ceded premiums to a Wachovia Reinsurance subsidiary in 2004.

amount to $6 billion of insurance premiums in exchange for assuming little or no risk." *See* Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction,* American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/ mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html, attached as Exhibit A (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say,* American Banker (Sept. 6, 2011, 4:55 PM), http://www. americanbanker.com/…/176_173/ mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-041928-1.html, attached as Exhibit B (hereinafter referred to as "Reinsurance Kickbacks").[2]

4.      As described in greater detail below, this was accomplished through a secretive "pay-to-play scheme"[3] that utilized carefully crafted excess-of-loss or purported "quota-share" reinsurance contracts that minimized risk exposure to bands of losses unlikely to be pierced.  Further, as described below, even with regard to the purported band of exposure, certain lenders, including Wachovia Bank and Wachovia Mortgage, insulated themselves from providing any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into the trusts supporting the reinsurance contracts and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage Kickback Scheme.

5.      As American *Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs . . . .

*See* Mortgage Kickback Scheme.

6.      In other words, these lenders—including Wachovia Bank and Wachovia Mortgage—were "playing with the house's money" with no risk of meaningful losses.  As *American Banker* aptly

---

[2]      In fact, "Bank of America recently spent $34 million to settle a RESPA class action suit accusing Countrywide of taking the same mortgage insurance kickbacks alleged by HUD investigators." *See* Reinsurance Kickbacks. *See also* Final Approval Order in *Alston v. Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa. July 29, 2011) at ECF No. 149.

[3]      *Id.*

1 || explained:

2 ||
> If defaults remained low, banks would pocket large premiums
3 || without paying any claims; if defaults were high, banks' losses would
be capped at the amount of their small initial investments, plus the
4 || premiums paid by homeowners and passed along to them by their
mortgage insurance partners. In other words, it appeared to be a no-
5 || lose proposition for the banks.

6 || *See* Mortgage Kickback Scheme.

7 ||        7.        In this action, Plaintiff challenges Defendants' hidden scheme to circumvent RESPA's

8 || strict prohibition against kickbacks, referral payments and unearned fee splits and seek statutory

9 || damages and/or restitution for Defendants' unjust enrichment. Each Defendant was a member of the

10 || scheme.

11 ||        8.        Homeowners who buy a home with less than a 20% down payment are typically

12 || required to pay for private mortgage insurance. *See* http://www.privatemi.com. Private mortgage

13 || insurance protects the lender in the event of a default by the borrower. *Id. See also* Exhibit C hereto

14 || at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements,"

15 || discussing the purpose of private mortgage insurance. Although the premium is paid by the borrower

16 || (either directly or indirectly, as further described below), borrowers typically have no opportunity to

17 || comparison-shop or select the provider of the private mortgage insurance. *See* Reinsurance

18 || Kickbacks ("Banks typically choose the insurance carrier . . . .).

19 ||        9.        Section 2607(a) of RESPA prohibits lenders from accepting kickbacks or referral fees

20 || from any person providing a real estate settlement service, including providers of private mortgage

21 || insurance. Thus, a lender cannot legally accept a referral fee from the insurer issuing the private

22 || mortgage insurance policy on the borrower's home. Similarly, Section 2607(a) of RESPA prohibits

23 || providers of private mortgage insurance from giving kickbacks or referrals fees to providers of real

24 || estate settlement services, including lenders and their affiliates. Accordingly, it is unlawful for

25 || providers of private mortgage insurance to pay referral fees to lenders and their affiliates.

26 ||        10.        Section 2607(b) of RESPA prohibits lenders from accepting any portion of a

27 || settlement service fee—including amounts paid by borrowers for private mortgage insurance—from

28 || any person providing a real estate settlement service, including providers of private mortgage

insurance, other than for services actually performed.  Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(b) of RESPA prohibits providers of private mortgage insurance from giving any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders and their affiliates, other than for services actually performed.  Accordingly, it is unlawful for providers of private mortgage insurance to pay unearned fee splits to lenders and their affiliates.

11.    Defendants have engaged in a scheme designed to circumvent RESPA's prohibition against kickbacks, referral payments and unearned fee splits.  Pursuant to the scheme, each Private Mortgage Insurer pays a portion of borrowers' private mortgage insurance premiums to Wachovia RE in the form of purported "reinsurance" premiums.

12.    While these payments to Wachovia RE are purportedly for "reinsurance" services, Wachovia RE receives these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.  From July 2005 through the end of 2008, Wachovia RE collected from the Private Mortgage Insurers at least **$45.7** million as its "share" of borrower's private mortgage insurance premiums.  In contrast, Wachovia RE's "share" of **paid c**laims during this time period was $1.1 million.[4]  *See* Schedule F – Part 3 from the 2005-2008 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by Wachovia RE).

13.    In this action, Plaintiff contends that, due to the ***structure*** of Defendants' captive reinsurance arrangements, and the essential terms missing therein, such arrangements were a sham and in violation of RESPA.

---

[4]    As further described below, although Wachovia RE paid additional "claims" during 2009 and 2010, the payment of such claims does not mean that it suffered a true reinsurance "loss."  Rather, it is the structure and missing essential terms of the reinsurance contracts themselves, which placed a hard ceiling on the ultimate level of "claims" paid, that renders the arrangements a sham in violation of RESPA.

14.    This unitary scheme was effectuated over time, with all Defendants acting in concert. Wachovia entered into identical contracts with each and every one of the defendant Private Mortgage Insurers.  Wachovia Bank, Wachovia Mortgage and Wachovia along with the Private Mortgage Insurers all actively participated in this single scheme.  Upon information and belief, the Private Mortgage Insurers had no choice but to enter into virtually identical reinsurance contracts with Wachovia RE or risk losing business. Wachovia had sole control over the contours of the reinsurance arrangements at issue and replicated the same arrangement with each Private Mortgage Insurer.  The fact that not one of the Private Mortgage Insurers either refused to enter into the reinsurance arrangement with Wachovia or reported Wachovia to the appropriate authorities demonstrates their complicity and participation in the scheme alleged which caused harm to each and every member of the class.  Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiff and the Class.  *See generally*, 12 U.S.C. § 2601(b).

15.    This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

17.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff's mortgage loan transaction is located in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**Plaintiff**

18.    Plaintiff Ahmad Ranjha, obtained a mortgage loan from Defendant Wachovia Mortgage Corporation a subsidiary of Wachovia Bank, N.A. on or about July 26, 2007 for the

purchase of his home located in Sacramento, California.[5]  *See* Exhibit D hereto,  Ahmad Rhanja Deed of Trust dated July 26, 2007.  In connection with his loan, Plaintiff was required to pay for private mortgage insurance in the amount of $136.00 per month.  His Private Mortgage Insurer, General Electric Mortgage Insurance Corp. ("Genworth"), was selected by his lender and was a provider with whom Wachovia had a captive reinsurance arrangement.

**Defendants**

  The Wachovia Defendants[6]

  19.    Defendant Wachovia Bank, N.A. was a national banking association which conducted business in California and throughout the United States. Wachovia Bank, N.A. was at all times material to the allegations herein a wholly owned subsidiary and primary banking affiliate of Wachovia Corporation.  *See* Exhibit H hereto (excerpts from Wachovia Corporation's 2005 Form 10-K, Ex. 21.01); Exhibit I hereto (excerpts from Wachovia Corporation's 2006 Form 10-K, Ex. 20.01); Exhibit J hereto (excerpts from Wachovia Corporation's 2007 Form 10-K, Ex. 21.01); Exhibit K hereto (excerpts from Wachovia Corporation's 2008 Form 10-K, Ex. 21.01); *see* Exhibit K hereto (excerpts from Wells Fargo & Company's 2008 10-K, following merger listing Wachovia Bank, Wachovia Mortgage Corporation and Wachovia RE as subsidiaries) at 4.  During the relevant time period, as alleged herein, Wachovia Bank, N.A. originated loans home loans throughout the United States and through its subsidiary Wachovia Mortgage Corporation.  *See* Exhibit L hereto (Wachovia

---

[5]    Following the acquisition of Wachovia Corporation in its entirety by Wells Fargo Corporation on December 31, 2008,  the lender on Plaintiff's loan became Wells Fargo Bank, N.A., through which entity Plaintiff modified his loan effective May 1, 2010.  Plaintiff's loan is now serviced by Wells Fargo.

[6]    Any reference herein to and of the Wachovia Defendants, including Wachovia Bank, N.A., Wachovia Mortgage Corporation and Wachovia RE includes their successors and/or assigns.  Wells Fargo & Company completed the acquisition of Wachovia Corporation and its subsidiary banks and the non banking subsidiaries of Wachovia Corporation on December 31, 2008.  *See* Exhibit E hereto, (excerpts of Wells Fargo Annual Report 2008) at 5; *see also* Exhibit F hereto, Federal Reserve Board approval of acquisition of Wachovia Corporation by Wells Fargo & Company dated October 12, 2008, and; Exhibit G hereto, State of North Carolina Department of State Articles of Merger of Wachovia Corporation with Wells Fargo & Company (as surviving entity).  As such, Wells Fargo & Company is successor and assign of Wachovia Bank, N.A. , Wachovia Mortgage Corporation and Wachovia RE and is liable for their conduct as alleged herein.

1   National Bank, National Association, Public Disclosure, Community Reinvestment Act Performance

2   Evaluation, dated June 30, 2006) at A-1.

3          20.    Defendant Wachovia Mortgage Corporation was a North Carolina Corporation (*see*

4   N.C. Articles of Amendment of Business Corp. renaming First Union Mortgage as Wachovia

5   Mortgage Corporation effective February 4, 2001 attached hereto as Exhibit M) was a wholly owned

6   subsidiary of Wachovia Bank, N.A. since January 1, 2003, and Wachovia Bank's lending subsidiary.

7   *See* Exhibit L at 7; *see also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007).  Wachovia Mortgage

8   Corporation conducted business in California and throughout the United States.  *Id.*

9          21.    Defendant Wachovia RE, Inc., was a South Carolina Corporation, incorporated on July

10   5, 2005 and dissolved on December 31, 2011.  *See* South Carolina Secretary of State Business filings

11   attached hereto as Exhibit N.  It was a subsidiary of Wachovia Corporation for all times material to

12   the allegations herein.  *See* Exhibits H-K (Wachovia Corporation's 10-K forms for the years 2005-

13   2008, listing Wachovia RE, Inc. as a subsidiary of Wachovia Corporation, Wachovia Bank, N.A. and

14   Wachovia Financial Services, Inc. for the years 2005 – 2008).

15         The Private Mortgage Insurer Defendants

16         22.    Defendant United Guaranty Residential Insurance Co. ("UGI") is a North Carolina

17   corporation headquartered in Greensboro, NC, and, during the Class Period, conducted business

18   throughout the United States.  According to the Annual Statements filed by UGI with the NAIC, UGI

19   ceded premiums to Defendant Wachovia RE, Inc., each and every year from and including 2006 up to

20   and through 2010 (the last year for which Annual Statements filed with the NAIC are currently

21   available).

22         23.    Defendant PMI Mortgage Insurance Co. ("PMI") is an Arizona corporation

23   headquartered in Walnut Creek, CA, and, during the Class Period, conducted business throughout the

24   United States.[7]  According to the Annual Statements filed by PMI with the NAIC, PMI ceded

25

26   [7]       On August 19, 2011, the Director of the Arizona Department of Insurance issued an order

27   placing PMI Mortgage Insurance Co. under supervision pursuant to § 20-169 of the Arizona Revised
    Statutes and requiring PMI Mortgage Insurance Co. to cease writing new commitments for insurance

28

premiums to Defendant Wachovia RE, Inc., each and every year from and including 2006 up to and through 2010 (the last year for which Annual Statements filed with the NAIC are currently available).

24.    Defendant Mortgage Guaranty Insurance Corp. ("MGIC") is a Wisconsin corporation headquartered in Milwaukee, WI, and, during the Class Period, conducted business throughout the United States, including in California.  According to the Annual Statements filed by MGIC with the NAIC, MGIC ceded premiums to Defendant Wachovia RE, Inc., each and every year from and including 2006 up to and through 2010 (the last year for which Annual Statements filed with the NAIC are currently available).

25.    Defendant Genworth Mortgage Insurance Corp. ("Genworth")[8] is a North Carolina corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Genworth with the NAIC, Genworth ceded premiums to Defendant Wachovia RE, Inc., each and every year from and including 2006 up to and through 2010 (the last year for which Annual Statements filed with the NAIC are currently available).

26.    Defendant Republic Mortgage Insurance Co. ("Republic") is a North Carolina

---

effective as of the close of business on August 19, 2011.  *See* http://phx.corporate-ir.net/phoenix. zhtml (Aug. 19, 2011 Press Release).  On October 20, 2011, the Director of the Arizona Department of Insurance obtained an interim "Order Directing Full and Exclusive Possession and Control of Insurer" with respect to PMI Mortgage Insurance Co. pursuant to § 20-172 of the Arizona Revised Statutes and, under the order, now has full possession, management and control of PMI Mortgage Insurance Co.  *See* http://www.id.state.az.us/announcements.html (Oct. 20, 2011 Announcement). The hearing on the Director's Application for Appointment of Receiver and Order to Show Cause was set to take place on January 10, 2012.  *See In re: The PMI Grp., Inc.*, No. 11-13730 (D. Del. Nov. 23, 2011) Declaration of L. Stephen Smith in Support of Chapter 11 Petition and Requests for First Day Relief ¶ 13.  In the wake of this recent seizure, PMI Group Inc., the parent company of PMI Mortgage Insurance Co., filed for Chapter 11 bankruptcy protection in Delaware on November 23, 2011. *See* http://phx.corporate-ir.net/phoenix.zhtml (Nov. 23, 2011 Press Release).  (Receivership hearings are scheduled for March 9, 2012, March 23, 2012, and March 30, 2012.)

[8]    General Electric Mortgage Insurance Corporation, Plaintiff's MI Provider, changed its name to Genworth Mortgage Insurance Corporation on July 1, 2005.  *See* Articles of Amendment, Articles of Incorporation of General Electric Mortgage Insurance Corporation, attached hereto as Exhibit O. On information and belief, the reference in Plaintiff's documents to General Electric Mortgage Insurance Corporation is to Genworth Mortgage Insurance Corporation.

1  corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business

2  throughout the United States. According to the Annual Statements filed by Republic with the NAIC,

3  Republic ceded premiums to Defendant Wachovia RE, Inc., each and every year from and including

4  2005 up through 2008

5       27.    Each Defendant is a proper party to this action as, upon information and belief, each

6  Defendant participated in the scheme alleged herein and was a provider or recipient of the unlawful

7  kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§

8  2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for

9  the referral of private mortgage insurance or any portion of an unearned fee and, further, Section 8(d)

10  of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times

11  the amount paid for the settlement service.

12                              **FACTUAL ALLEGATIONS**

13  **Wachovia's Mortgage Operations**

14       28.    Wachovia Bank, N.A. was a federally-chartered national bank which delivered a wide

15  array of banking, lending and investment services to individual consumers and small businesses doing

16  business in California and throughout the United States.  Wachovia Bank N.A. originated and

17  serviced, and, during the Class Period, originated and serviced, residential real estate loans throughout

18  the United States through, *inter alia,* its subsidiary, Wachovia Mortgage Corporation.  *See Watters v.*

19  *Wachovia Bank, N.A.*, 550 U.S. 1 (2007).

20       29.    Wachovia's nationwide business included mortgage lending, through online banking

21  and its 3,400 retail banking offices located in 21 states.  *See* Exhibit P hereto (excerpts from

22  Wachovia Corporation's 2007 Annual Report, Overview).

23  **Private Mortgage Insurance Industry**

24       30.    Each of the Defendant Private Mortgage Insurers provides or provided mortgage

25  insurance for the protection of residential mortgage lenders such as Wachovia Bank and Wachovia

26  Mortgage and was a party to a captive reinsurance agreement with Wachovia RE.

27       31.    The private mortgage insurance industry began with the founding of Mortgage

28  Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and several

other private mortgage insurers, including the Defendant Private Mortgage Insurers—UGI, PMI, Genworth, and Republic.  Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").  *See* http://www.privatemi.com/news/ index.cfm.  According to its website, MICA's members include each of the foregoing insurers, with the exception of UGI.  *See* http://www.privatemi.com/about.cfm.

32.     According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007.  *See* http://www.privatemi.com/about.cfm.

33.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

34.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.  *See also* Exhibit C at 1-2, discussing the purpose of mortgage insurance.

35.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *See* Exhibit C at 1-2.

36.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.  *See* http://www.privatemi.com/toolsresources/faqs.cfm.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

37.     While the lender is the beneficiary of the private mortgage insurance, the borrower

1  pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's

2  monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender

3  pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the

4  borrower in the form of a higher interest rate for the life of the loan).

5      38.    Borrowers generally have no opportunity to comparison-shop for private mortgage

6  insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of

7  the insurance policy, as well as the cost of the policy, are determined by the lender and the provider

8  of private mortgage insurance, rather than negotiated between the borrower and the provider of

9  private mortgage insurance. *See, e.g.,* http://www.privatemi.com/toolsresources/faqs.cfm. *See also*

10  Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

11      39.    Private mortgage insurance is limited to the conventional home loan market.

12  Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as

13  those maintained by the Federal Housing Administration, the Department of Veterans Affairs and the

14  Department of Agriculture maintain their own form of mortgage default insurance.  *See*

15  http://www.privatemi.com/news/factsheets/2010-2011.pdf.

16  **RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage**

17  **Insurance Policies**

18      40.    RESPA is the primary federal law regulating residential mortgage settlement services

19  and/or business incident to real estate settlement services.  For most of the Class Period, the United

20  States Department of Housing and Urban Development ("HUD") was charged with enforcing

21  RESPA.  HUD has promulgated the implementing rules for RESPA.  *See* Regulation X, 24 C.F.R. §

22  3500.

23      41.    As of July 21, 2011, RESPA is now administered and enforced by the Consumer

24  Financial Protection Bureau ("CFPB").  The CFPB was established by the Wall Street Reform and

25  Consumer Protection Act of 2010 (Dodd-Frank Act). *See* Dodd-Frank Act §§ 1002(12)(M), 1024(b)-

26  (c), and 1025(b)-(c); 12 U.S.C. §§ 5481(12)(M), 5514(b)-(c), and 5515(b)-(c).

27      42.    RESPA was enacted, in part, to curb the problem of kickbacks between real estate

28  agents, lenders and other real estate settlement service providers and/or providers of business incident

to real estate settlement services. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

43.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

44.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any contract or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

45.    RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

46.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

47.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . . The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24 C.F.R. § 3500.14(d).

48.    Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). The term "settlement service" is liberally defined in RESPA and

1    Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. §

2    3500.2(b).

3         49.    Under RESPA, therefore: (a) Wachovia is prohibited from accepting referral fees from

4    a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private

5    Mortgage Insurer other than for services actually performed by the captive reinsurer; and (b) the

6    Private Mortgage Insurers are prohibited from paying referral fees to Wachovia or from paying to

7    Wachovia any split of private mortgage insurance premiums other than for services actually

8    performed by the captive reinsurer.

9    **Mortgage Reinsurance**

10        50.    Beginning in the mid to late 1990s, mortgage companies began looking for ways to

11   capitalize on the booming profitability of the private mortgage insurance market. *See* Exhibit Q

12   hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance,* (Mar.

13   23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml).

14        51.    In order to "share in these profits," lenders typically create reinsurance subsidiaries to

15   enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically

16   agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.

17   *Id.*  In return for guaranteeing a steady stream of business, the private mortgage insurer cedes to the

18   reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

19        52.    Mortgage reinsurance arrangements can generally take one of two forms: (a) "quota

20   share," or (b) "excess-of-loss."

21        53.    In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a

22   fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage

23   insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed

24   upon in the reinsurance contract.  However, quota share arrangements do not constitute real or

25   commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's

26   liability to pay claims to the assets held in the trust accounts established for each mortgage insurer

27   into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums

28   that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the

reinsurer.[9]

54.     In contrast to the typical quota share arrangement, where the private mortgage insurer and reinsurer are *expected* to share losses beginning with the first dollar of loss paid, in an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and ends when such losses reach the detachment point.

55.     An excess-of-loss arrangement does not, however, necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer as required by RESPA.  Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

56.     Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum,* Winter 2006, at 282-283,

---

[9]     As noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap*** . . . a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit R hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).

1  attached hereto as Exhibit S; *see generally* Statement of Financial Accounting Standards No. 113,

2  "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts,"

3  (December 1992) at 7, attached hereto as Exhibit T.

4       57.    The likelihood of the reinsurer experiencing any real losses (as opposed to merely

5  paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement

6  depends not only on the amount of losses paid by the private mortgage insurer (*i.e.,* whether the

7  amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay

8  claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private

9  mortgage insurer exposes the reinsurer to any real possibility that it may be **required** to contribute its

10  **own** money when called upon by the primary private mortgage insurer to pay for its share of losses.

11  The absence of any likelihood that the reinsurer will experience any real losses, in turn, reveals the

12  reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.

13  Such an arrangement does not constitute real, risk-transferring or commensurately priced reinsurance.

14  **Captive Mortgage Reinsurance Arrangements**

15       58.    Lenders produce customers for private mortgage insurers.  In the early years of the

16  private mortgage insurance industry, there were no financial ties between lenders and the private

17  mortgage insurers.  *See* Reinsurance Kickbacks.

18       59.    However, mortgage lenders such as Wachovia Bank and Wachovia Mortgage, seeking

19  to capitalize on the hundreds of millions of dollars its borrowers pay to private mortgage insurers in

20  premiums each year, entered into a scheme with the Defendant Private Mortgage Insurers to establish

21  its own affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the

22  [Defendant Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance

23  deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the

24  lenders and who initially used reinsurance deals as marketing tools).  *See* Mortgage Kickback

25  Scheme; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage

26  Banking, February 1, 1998, attached hereto as Exhibit U.

27       60.    Upon information and belief, lender captive reinsurers provide reinsurance primarily

28  or exclusively for loans the lender originates, funds and/or originates through correspondent lending

and which include private mortgage insurance.  Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

61.    Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters."  *See* Reinsurance Kickbacks.

62.    This is because some lenders, including Wachovia Bank and Wachovia Mortgage, collaborated with private mortgage insurers to create lucrative excess-of-loss and/or quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk.  As American *Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it.  The problem was how they split up the risks and rewards of insuring homeowners' mortgages."  *See* Reinsurance Kickbacks.

63.    Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims.  *See, e.g.*, Exhibit C at 4, discussing the use of a trust fund.

64.    Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

1  *See* Exhibit C at 3.

2  65. Thus, all claims under a reinsurance contract with a particular private mortgage insurer

3  can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than

4  only from premiums ceded for a given book year. *See* Exhibit C at 3. Moreover, upon information

5  and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be

6  released as dividends to the captive reinsurer. Thus, the ceded premiums which are deposited into the

7  trusts remain there until they are paid out to cover claims, paid out to cover administrative expenses

8  incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

9  66. Typically, by design, lenders' captive reinsurance contracts with private mortgage

10  insurers, such as Wachovia's contracts with the Private Mortgage Insurers, limit the lenders'

11  liability/payment responsibilities under the contracts through provisions that permit the captive

12  reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the

13  trust supporting the reinsurance contract. *See* Reinsurance Kickbacks.

14  67. While the captive reinsurer is facially required to maintain the trust fund's net assets at

15  a level required by state law (typically, upon information and belief, 10% of the current cumulative

16  loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through,

17  *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no

18  monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently

19  funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.

20  *See* Reinsurance Kickbacks.

21  68. Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is

22  commonly limited to the amount held in the trust account established for the mortgage insurer—no

23  matter what state law or regulation, or even other portions of the reinsurance contracts, require. This

24  is accomplished either through concurrent contractual provisions expressly providing that the captive

25  reinsurer and its affiliates have no exposure for the failure to adequately fund the trusts or through an

26

27

28

unwritten understanding of the parties.[10]

69.    As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses. Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

70.    In other words, should the captive reinsurer choose not to maintain the required funds in the trust (as, upon information and belief Wachovia decided here), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations— no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

71.    Typically, lenders' captive reinsurance arrangements provide yet another layer of protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds.  If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.

> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

*See* Reinsurance Kickbacks.

72.    Lenders have aggressively pursued such arrangements with private mortgage insurers.

---

[10]    *See* Exhibit V attached hereto, OCC Corporate Decision #99-37, October 1999, at 5 (affirming that Wachovia Bank's "potential liability for the Subsidiary's [*i.e.,* Wachovia RE] reinsurance obligation will not exceed [Wachovia Bank's] investment in the Subsidiary [Wachovia RE]"; *see also id.* at fn.8, stating, "The Bank's [Wachovia Bank] total exposure to the mortgage reinsurance activities will be limited, therefore, to the amount of its capital investment."

1    As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the

2    escalating cost of the reinsurance payments, banks threatened or punished companies that balked at

3    providing them." *See* Reinsurance Kickbacks.

4         73.   *American Banker* reported that GE Capital Mortgage Insurance (a predecessor of

5    Genworth) described the lenders' aggressive pursuit as "feeding the beast" in a 1999 Power Point

6    presentation to one lender obtained by HUD investigators. *See* Reinsurance Kickbacks. In the

7    presentation, Genworth warned that "the MI industry and lenders won't be able to defend/sustain

8    these structures." *Id*.

9         74.   Captive mortgage reinsurance arrangements such as Wachovia's arrangements with

10   the Private Mortgage Insurers raise obvious RESPA kickback/fee-splitting problems. Private

11   mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating

12   with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the

13   private mortgage insurers. The private mortgage insurer stimulates/guarantees its business by

14   providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

15         75.   As opposed to receiving direct payments for referring its customers to a certain private

16   mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described above, to

17   funnel such unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance

18   subsidiaries.

19         76.   As actuarial firm Milliman, Inc. acknowledged, if everything went as planned, the

20   scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the

21   above arrangement, from the lender's perspective, is financially equivalent to ***receiving a commission***

22   ***or profit sharing equal to a percentage of premium***." *See* Exhibit K (emphasis added).

23   **HUD's Concern About RESPA Anti-kickback Violations Under Captive Reinsurance**
**Arrangements**

24

25         77.   Concerned that captive reinsurance arrangements would be designed to disguise a

26   funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain

27   the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of

28   captive reinsurers and RESPA's anti-kickback violations. *See* HUD Letter, attached as Exhibit W.

78.     The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and, (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original). *See* Exhibit W at 3.

79.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." In determining whether there is a real transfer of risk, HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *See* Exhibit W at 3.

80.     The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original). *See* Exhibit W at 3.[11]

81.     The HUD letter contrasts the excess-of-loss method of captive mortgage reinsurance, stating that excess-of-loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> [I]f the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid . . . must be commensurate with the risk.

*See* Exhibit W at 3. In other words, even if there is some transfer of risk, the reinsurance arrangement will still violate RESPA unless the amount paid (*e.g.,* the premiums ceded) is commensurate with the risk transferred.[12]

---

[11]     As noted above, even quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.

[12]     As explained above, RESPA is now administered and enforced by the CFPB. *American*

**Wachovia's Captive Reinsurance Arrangements with the Defendant Private Mortgage Insurers**

82.    During the Class Period, in connection with the millions of dollars in home loans originated, funded and/or originated through correspondent lending by Wachovia Bank and/or Wachovia Mortgage, many of their borrowers paid for private mortgage insurance.

83.    Also during the Class Period, Defendant Wachovia RE was a party to captive reinsurance arrangements with each of the Defendant Private Mortgage Insurers.  Pursuant to these virtually identical arrangements, Wachovia Bank and/or Wachovia Mortgage referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance or other appropriate metric among, the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with Wachovia RE under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to Wachovia RE.  Wachovia Bank, Wachovia Mortgage Company and Wachovia RE in coordination with the Private Mortgage Insurers acted together over time to effect this single scheme which caused harm to Plaintiff and each and every class member.   Upon information and belief, the Private Mortgage Insurers had no choice but to participate because lenders produced business for them and had no choice but to agree to the terms and conditions established by the Lenders who had sole control.  Notably, upon information and belief, each of the Private Mortgage Insurers participated without demur and not one attempted to put an end to the lender's activities by reporting the conduct to the authorities.   Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiff and the Class.  *See generally*, 12 U.S.C. § 2601(b).

84.    Wachovia RE entered into reinsurance contracts solely with respect to loans

---

*Banker* recently reported that the CFPB has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme—the same type of scheme described herein.  The investigation is the CFPB's first known formal investigation.  *See* Jeff Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American Banker (Jan. 10, 2012, 4:31 PM), http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-1.html, attached as Exhibit X.

1   originated, funded, and/or originated through correspondent lending by Wachovia Bank and/or

2   Wachovia Mortgage during the Class Period.  Further such agreements were in the form of aggregate

3   excess-of-loss reinsurance contracts.  *See* Exhibit V (OCC Corporate Decision #99-37 at 3).[13]

4        85.   Upon information and belief, under each of Wachovia's excess-of-loss captive

5   reinsurance arrangements, the Defendant Private Mortgage Insurer pays Wachovia RE a percentage

6   of the premiums paid by borrowers on a particular pool of loans; in return, Wachovia RE purportedly

7   agrees to assume a portion of the insurer's risk of loss with respect to the loans involved.

8        86.   In fact, each of Defendants' carefully-crafted reinsurance contracts does not provide

9   for "real transfer of risk" and, under any analysis, are not "commensurately" priced.

10       87.   Upon information and belief, under its reinsurance contracts, Wachovia RE established

11  a separate trust fund for each Private Mortgage Insurer into which the Private Mortgage Insurer

12  deposited the contractually-determined ceded portions of the premiums that it collected from

13  borrowers.  Upon information and belief, Wachovia RE is facially required, pursuant to its contracts

14  with the Private Mortgage Insurers, to maintain through, *inter alia,* capital infusions and ceded

15  premiums, each trust fund's net assets at a level required by state law to fund claims made under the

16  reinsurance contracts.

17       88.   Upon information and belief, for the reasons described above, Wachovia RE's

18  potential exposure for payment of reinsurance claims is limited to the amount held in the trust account

19  established for the mortgage insurer—effectively insulating Wachovia from liability for failing to

20  _____

21  [13]   On October 29, 1999 the Office of the Comptroller of the Currency ("OCC") approved the
    application of Wachovia Bank, N.A. to establish an operating subsidiary to reinsure a portion of the

22  mortgage insurance on loans, serviced, originated or purchased by Wachovia Bank, N.A. or the
    Bank's mortgage lending subsidiary (listed as Wachovia Mortgage Company) or other bank affiliates.

23  Wachovia Mortgage Company no longer exists.  Wachovia Mortgage Company was merged into
    Wachovia Bank, N.A. on July 1, 2000.  *See* Exhibit Y (Articles of Merger of Wachovia Mortgage

24  Company with and into Wachovia Bank, National Association).  As such, this OCC Corporate
    Decision defines the limits of Wachovia Bank's reinsurance arrangements through an operating

25  subsidiary as Wachovia Mortgage Corporation is a bank affiliate.  *See* Exhibit Z attached hereto
    (Investment in Subsidiaries and Equities, Comptroller's Licensing manual, Washington, DC) at 11,

26  63.  Moreover, the guidance contained in the OCC's Comptroller's Licensing describing the contours
    of this kind of reinsurance relationship refers specifically to Corporate Decision #99-37 and several

27  others.

28

maintain the trusts adequately to pay claims and leaving the Private Mortgage Insurers with no recourse.[14]

89.    Consequently, Wachovia's captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between Wachovia RE and the Defendant Private Mortgage Insurers.

90.    As HUD noted during testimony by Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* Exhibit AA hereto (April 26, 2006 testimony of Gary M. Cunningham).

91.    Such is the case with Wachovia.  As reflected in the table below, from the beginning of 2005 through the end of 2010, Wachovia RE collected from the Private Mortgage Insurers at least **$67** million as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $5.5 million, as depicted in the chart below:[15]

---

[14]    *See* Exhibit V at 5 (regarding Wachovia Bank, N.A.'s commitments made in its application to expand the activities of its mortgage reinsurance operating subsidiary to include reinsuring mortgage insurance on mortgage loans serviced, made or purchased by Wachovia or its lenders and noting that "[n]either Wachovia nor any of its subsidiaries nor affiliates will guarantee the activities or obligations of the Subsidiary [Wachovia RE] or provide the Subsidiary [Wachovia RE] with any other credit enhancement.  The Bank's [Wachovia Bank] total exposure to the mortgage reinsurance activities will be limited, therefore, to the amount of its capital investment."

[15]    These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2010. Plaintiffs' investigation is ongoing.  Upon information and belief, from 2005–2010, all premiums listed as ceded to Wachovia RE, South Carolina and Wachovia Mortgage Reinsurance, a Vermont, were ceded to Wachovia RE as the Wachovia Mortgage Reinsurance was dissolved in 2002.  *See* Exhibit BB attached hereto (Vermont Secretary of State Corporate listing for Wachovia Mortgage Reinsurance listing it as dissolved on December 30, 2002).  Should discovery reveal that Wachovia Mortgage Reinsurance continued to collect ceded premiums, Plaintiff reserves the right to amend his Complaint to add Wachovia Mortgage Reinsurance Company and/or its successors and assigns.

**Wachovia Reinsurance**
**Aggregate Premiums Received and Claims Paid 2005-2010**



92.    As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse." *See* Reinsurance Kickbacks.

93.    Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history. *See, e.g.,* Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown,* CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit CC. Thus, it is not at all surprising that claims were paid from the trusts during 2009 and 2010.

94.    Further, paid claims, as discussed herein, do not establish that the reinsurance contracts at issue constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA. Upon information and belief, even after paying some claims during 2009 and 2010, due to the *structure* of the reinsurance agreements, Defendants continued to carry no true risk of loss and the premiums received by Wachovia RE far exceeded any risk that Wachovia RE purportedly assumed.

95.    Payments from the reinsurance trusts to the Private Mortgage Insurers do not constitute "losses" to the reinsurer. The reinsurer will either: (1) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in "reinsurance claims" or (2) have the option to "walk-away" from its reinsurance obligations if it is called upon to pay more in reinsurance claims than is available in the trust accounts. The premiums

1  received and deposited into the trust accounts effectively cover all "losses" or reinsurance claims

2  payments.

3      96.    Under accepted accounting and actuarial principles, in order for a contract to be treated

4  as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably

5  possible that the reinsurer may realize a significant loss." *See* Exhibit S at 282-83; *see generally*

6  Exhibit T at 7.

7      97.    Insurers and reinsurers are subject to two sets of accounting standards in the United

8  States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting principles

9  (GAAP)." *See* Exhibit DD attached hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk*

10  Financing *in the US and the EU:A Comparative Analysis of Alternative Regulatory Approaches,* The

11  Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state

12  insurance regulators through the NAIC, and insurers are required to file detailed financial statements

13  and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial

14  Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-

15  regulatory financial statements and Securities and Exchange Commission (SEC) reports."  *Id.*

16      98.    FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things,

17  abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that have the

18  formal appearance of reinsurance but do not transfer significant insurance risk and this should not be

19  eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates

20  the same language as FAS 113, was implemented shortly thereafter to address the same issues with

21  respect to statutory accounting." *See* Exhibit S at 282-83.

22      99.    Under FAS 113, "in order for a contract to qualify for reinsurance accounting

23  treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a

24  reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two

25  conditions:

26          1.    It must be evident that 'the reinsurer has assumed
           substantially all of the insurance risk relating to the reinsured portion
27          of the underlying insurance contracts' (paragraph 11), or

28

25

2.      The reinsurer must 'assume significant insurance risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b)."

*Id*. at 283; *see generally* Exhibit T at 7.  Given the trust cap limitation and other risk/liability/recourse limiting features in each of Defendants' reinsurance contracts, only the second test identified by FAS 113 is relevant here.  Indeed, the first test is viewed as an exception to the second.  *See* Exhibit S at 283.  The "primary" test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if:

a.      The reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts, and

b.      It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit T at 7.

100.    Further, FAS 113 provides the blueprint for how to structure a "real risk transfer" analysis:

The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized.  The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.

Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value of the amounts paid . . . to the reinsurer.

*Id*. at 7.

101.    SSAP 62R's test for whether real risk transfer is found in a reinsurance contract is substantively identical:[16]

---

[16]    "The above provisions of SSAP 62 are essentially the same as those in FAS 113."  *See*

    1.      The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and

    2.      It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit EE attached hereto at paragraph 13, SAP 62R-6 (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Exhibit A "Implementation Questions and Answers).[17]

102.    Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits." *See* Exhibit T at 4; *see generally* Exhibit FF hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

103.    In a deposit accounting/no risk transfer arrangement, loss to the Private Mortgage Insurer is not equivalent to loss to the reinsurer—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit accounting/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Risk transfer does not equate "loss" to the reinsurer with "loss" to the Private Mortgage Insurers in a deposit/no risk transfer arrangement—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Payment of "claims" under a "deposit accounting"/reinsurance contract is not an infrequent or unusual event.  Rather, it is specifically

---

American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, http://www.actuary.org/pdf/casualty/risk_transfer.pdf.

[17]    *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably possible if its probability is more than remote.").

anticipated, and accounting of such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules.  *See* Exhibit EE at paragraph 35, SAP 62R-11 at b (referencing "disbursements"), e (referencing "settlement of losses"), and f (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit GG hereto (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph b, referencing "disbursements," paragraph d, referencing "settlement of losses," and paragraph e, referencing loss and loss adjustment expense)).

104.   As set forth above, the risk transfer evaluation does not end at the first "claim" payment from each reinsurance trust to a Private Mortgage Insurer.  The HUD Letter phrase that "there is no reasonable expectation that the ***reinsurer*** will ever have to pay claims" does not mean that when the ***first claim*** is paid out of a reinsurance trust, real risk is transferred.  *See* Exhibit W at 6 (emphasis added).  That ***first claim***, by definition, would be paid out of the premiums placed into the trust by the ceding Private Mortgage Insurer.  The ***reinsurer*** only pays after ceded premiums are exhausted.  The "reinsurer" does not pay "claims," or suffer "losses" under a reinsurance arrangement in a risk transfer sense, until its own capital is utilized, and not "repaid" through dividends or otherwise.  Until then, the reinsurance trusts are just returning ceded premiums paid by the Private Mortgage Insurers.

105.   To the extent, then, that claims have been made from the reinsurance trusts under Wachovia RE's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish a *bona fide* risk-transferring reinsurance arrangement nor does it establish that Defendants have suffered a true reinsurance "loss."  In fact, the structure and missing essential terms of the reinsurance contracts themselves negate any exposure to reinsurance losses rendering the arrangements a sham.

106.   Indeed, at least one state regulator explicitly concluded, that no real transfer of risk exists where reinsurance agreements include liability limiting provisions or lack sufficient recourse pursuant to the contract to ensure that the reinsurer lives up to its commitments.  The State of Arizona Department of Insurance, in a statement (E-MG.CEDE–Rev. 12/09) discussing the filing by mortgage insurers of certain schedules with the state, made clear its view that mortgage reinsurance

arrangements:

- that had unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds,

result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines." *See* Exhibit HH hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers).

107.    As *American Banker* observed, "the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks." *See* Reinsurance Kickbacks.

108.    The over $67 million dollars paid by the Defendant Private Mortgage Insurers and collected by Wachovia through its captive reinsurer from the beginning of 2005 through the end of 2010 have clearly not been commensurate to its actual risk exposure. The Defendant Private Mortgage Insurers have paid, and Wachovia has received, over $67 million dollars in ceded premiums, while Wachovia bore little or no risk of loss.

109.    In reality, Defendants' captive reinsurance arrangements were and are sham transactions providing for the transfer of kickbacks and unearned fees in violation of RESPA.

110.    The money which Wachovia collected from the Defendant Private Mortgage Insurers through Wachovia RE far exceeded the value of the services, if any, it performed. There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer. The amounts paid were simply disguised kickbacks to Wachovia for the referral of borrowers to the Defendant Private Mortgage Insurers.

111.    These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. In other words, because the money

1   collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance

2   premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance

3   coverage and private mortgage insurers' unlawful kickbacks to lenders.[18]

4   112.   Amounts paid to lenders as unlawful kickbacks have become a part of the cost of

5   doing business for private mortgage insurers.  As a result, private mortgage insurance premiums

6   incorporate the payment of such kickbacks—to the detriment of consumers and in contravention of

7   the stated purpose of RESPA.

8   **CLASS ACTION ALLEGATIONS**

9   113.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and

10   23(b)(1) and/or (b)(3) on behalf of himself and a class of all other similarly situated persons who

11   obtained residential mortgage loans originated, funded and/or originated through correspondent

12   lending by Wachovia Bank and/or Wachovia or any of its subsidiaries and/or affiliates between July

13   5, 2005 and the present and, in connection therewith, purchased private mortgage insurance and

14   whose residential mortgage loans were included within Wachovia's captive mortgage reinsurance

15   arrangements (the "Class").

16   114.   The Class excludes Defendants and any entity in which Defendants have a controlling

17   interest, and their officers, directors, legal representatives, successors and assigns.

18   115.   The Class is so numerous that joinder of all members is impracticable.

19   116.   A class action is superior to all other available methods for the fair and efficient

20   adjudication of this controversy.

21   117.   Plaintiff's claims are typical of the claims of the Class.

22   118.   There are questions of law and fact common to the Class, the answers to which will

23   advance the resolution of the claims of all class members, including but not limited to:

24   

25   [18]   Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the

26   Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced

27   borrowers to buy more expensive policies than they needed.  "Nearly all loan files reviewed show
borrowers with excessive coverage placed on their loan," the presentation concluded.  *See*

28   Reinsurance Kickbacks.

1        a.    Whether Defendants' captive reinsurance arrangements involved sufficient

2 transfer of risk;

3        b.    Whether payments to Wachovia RE were *bona fide* compensation and solely

4 for services actually performed;

5        c.    Whether payments to Wachovia RE exceeded the value of any services

6 actually performed;

7        d.    Whether Defendants' captive reinsurance arrangements constituted unlawful

8 kickbacks from the Private Mortgage Insurers;

9        e.    Whether Wachovia accepted referral fees from the Private Mortgage Insurers

10 or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private

11 Mortgage Insurers other than for services actually performed;

12        f.    Whether the Private Mortgage Insurers paid or gave referral fees to Wachovia

13 or a portion, split or percentage of borrowers' private mortgage insurance premiums to Wachovia

14 other than for services actually performed; and

15        g.    Whether Defendants are liable to Plaintiff and the Class for statutory damages

16 pursuant to RESPA § 2607(d)(2).

17    119.    These and other questions of law and/or fact are common to the Class and predominate

18 over any questions affecting only individual Class members.  The basic terms and contours of

19 Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual

20 consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools of loans.

21 Further, each and every Class member that Plaintiff seeks to represent was required, as part and

22 parcel of obtaining their Wachovia Bank and/or Wachovia Mortgage home loan, to pay for private

23 mortgage insurance.  Each and every Class member was directed to obtain private mortgage

24 insurance from one of the Defendant Private Mortgage Insurers—each of whom had reinsurance

25 contracts with Wachovia RE, structured as challenged here, to purchase "reinsurance" on that private

26 mortgage insurance.  The essential and basic terms of each of those "reinsurance" contracts between

27 Wachovia RE and the Defendant Private Mortgage Insurers were, for all intents and purposes,

28 materially the same—and each of the Class members, no matter the Private Mortgage Insurer to

whom they were referred, suffered the same harm, entitling them to demand the same statutory damages. Accordingly, this is the quintessential consumer class action lawsuit.

120. The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded Wachovia Bank or Wachovia or originated through correspondent lending. Regardless of whether Wachovia Bank, Wachovia Mortgage or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

121. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

122. Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

123. Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

124. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## TOLLING OF STATUTE OF LIMITATIONS

125. Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule. For Plaintiff and putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling

1  is available under RESPA and clearly should apply.  Plaintiff and members of the putative Class

2  could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.

3  Further, Defendants knowingly and actively concealed the basis for Plaintiff's claims by engaging in

4  a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any

5  delay by the members of the putative Class whose claims accrued prior to one year preceding the

6  commencement of this action was excusable.

7        126.  Due to the complex, undisclosed and self-concealing nature of Defendants' scheme to

8  provide for the payment of illegal kickbacks from the Private Mortgage Insurers to Wachovia,

9  Plaintiff and putative Class members whose claims accrued prior to one year preceding the

10  commencement of this action did not possess sufficient information or possess the requisite expertise

11  in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

12        127.  As *American Banker* reported, "making matters worse, banks allegedly forced

13  unknowing consumers to buy more insurance than they needed *and failed to properly disclose the*

14  *reinsurance contracts*, another RESPA violation."  *See* Reinsurance Kickbacks (emphasis added).  In

15  fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in

16  advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told

17  customers that the charge for the reinsurance was 'none.'" *Id*.

18        128.  This complex action is dissimilar to a simple type of RESPA case where, for example,

19  an attentive borrower may determine—from a careful examination of his HUD-1 settlement

20  statement—that he or she was overcharged for a settlement service or that too much money is being

21  paid to his or her lender, real estate agent, title insurer or other settlement service provider.  Rather,

22  the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for

23  the average homeowner to follow that is intentionally concealed through affirmative

24  misrepresentations about the nature and *bona fides* of Defendants' reinsurance arrangements.

25        129.  Plaintiff was able to discover the underlying basis for the claims alleged herein only

26  with the assistance of counsel.  Plaintiff and the putative Class members had no basis upon which to

27  investigate the validity of the undisclosed payments from the Defendant Private Mortgage Insurers to

28  Wachovia RE for purported reinsurance.  Plaintiff's and the putative Class members' delay was

1    excusable because they did not discover, and reasonably could not have discovered, Defendants'

2    conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

3        130.    Once Plaintiff discovered the underlying basis for the claims alleged herein with the

4    assistance of counsel, Plaintiff contacted the insurance department of Wells Fargo in January and

5    February 2012, in an effort to obtain further information about the reinsurance of the private

6    mortgage insurance on his current mortgage and to ask that his loan be removed from Defendants'

7    captive reinsurance program.  Mr. Ranjha first called the insurance department and customer service

8    department on January 19, 2012.  The representatives in each of these departments with whom Mr.

9    Ranjha spoke told him that, "I don't think we have any reinsurance."  In addition, the women in the

10   insurance department professed no knowledge of reinsurance of PMI, and refused to look up Mr.

11   Ranjha's loan although he offered his loan number in an attempt to facilitate a search for an answer to

12   his question and get his PMI removed from the reinsurance program.

13       131.    In a further effort to obtain information about the reinsurance of his mortgage

14   insurance and to have his mortgage insurance removed from Defendants' captive reinsurance

15   arrangements, Plaintiff Ranjha also called Genworth, his mortgage insurance provider as described

16   above, on January 19, 2012.  The Genworth employee with whom Mr. Ranjha spoke told him that she

17   "doesn't know anything about reinsurance."  Like the Wells Fargo representative, she also refused to

18   use Plaintiff's loan number, which he provided to her, to look up his loan and advised that since

19   Genworth's agreement was not with him, she could not provide further information to him.

20       132.    Plaintiff Ranjha made one final attempt to obtain information about the reinsurance of

21   his mortgage insurance.  On February 27, 2012, Plaintiff Rhanja, again, called Wells Fargo's

22   insurance department.  He spoke to a customer service representative named Belighanna Cotner who

23   was only able to confirm that there was PMI on his loan, but who knew nothing about any

24   reinsurance.

25       133.    Further, Defendants engaged in affirmative acts and/or purposeful non-disclosure to

26   conceal the facts and circumstances giving rise to the claims asserted herein and made false

27   representations about the nature of its reinsurance arrangements.  Such acts are separate and distinct

28   from the conduct violative of RESPA.

134.    Wachovia Bank and Wachovia Mortgage used their form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer, Wachovia RE, and the lender, Wachovia Bank and/or Wachovia Re, and to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses, or given to them from the Private Mortgage Insurer Defendants through referral, were for actual services rendered.

135.    The "Wachovia Affiliated Business Disclosure" provided to the Plaintiff at his closing does not list Wachovia RE or Wachovia Bank, N. A. as an affiliates or subsidiaries.  *See* Exhibit II (Wachovia Affiliated Business Disclosure).

136.    Even when some industry analyst and ratings agencies questioned the captive reinsurance deals, banks *and* insurers publicly maintained that they met the standards set forth in the HUD letter.  *See* Reinsurance Kickbacks.

137.    Upon information and belief, Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators.  As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off on the structures.  To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.

> Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

138.    Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of Wachovia's captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert.  Clearly, a mortgage provision stating that Wachovia ***may*** enter into captive reinsurance relationships (*see* Exhibit D at ¶ 10)  is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated.  *See,*

*e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess"). This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

139.  Similarly, it is beyond unrealistic to expect members of the putative Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurer Defendants did not begin until around 2007, years after the transactions came into existence. *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

140.  Wachovia intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them on notice of the underlying basis for their claims and affirmatively misrepresent the nature of Defendants' conduct. The putative class members were not put on notice of Wachovia's wrongdoing. For instance, Wachovia did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by Wachovia RE.

141.  Defendants' alleged and ubiquitous misrepresentations about the legitimacy of their captive reinsurance arrangements as *bona fide* in various standardized mortgage and closing documents are separate and distinct acts of concealment that misled Plaintiff and members of the putative Class.

142.  Further, upon information and belief, Wachovia RE and other captive reinsurance companies incorporated in "captive-friendly" states are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies. *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached as Exhibit JJ ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a

regulator."); *see also* Mortgage Kickback Scheme (noting that Vermont ranks among the world's top three domiciles along with Bermuda and the Cayman Islands). Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on Wachovia Bank and/or Wachovia Mortgage's captive reinsurer. One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

143. For instance, HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

*See* Mortgage Kickback Scheme (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

144. Putative Class members exercised due diligence by fully participating in their loan transactions. Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

145. Wachovia Bank and/or Wachovia Mortgage provided misleading and false information to Plaintiff and the Class, thus affirmatively acting to conceal their unlawful kickback scheme. By funneling kickbacks through Wachovia RE and representing that such payments were for services actually performed, rather than referral fees, Wachovia Bank and Wachovia Mortgage acted to conceal and prevent Plaintiff from discovering the underlying basis for this action. Any delay by the absent putative Class members is excusable and, accordingly, Plaintiff and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**(VIOLATION OF RESPA, 12 U.S.C. § 2607)**

146.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

147.    Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

148.    Plaintiff and the Class obtained federally-related residential mortgage loans through Wachovia Bank and/or Wachovia Mortgage and collectively paid over $67 million dollars for private mortgage insurance premiums in connection with their real estate closings during the class period.

149.    The amounts paid by the Defendant Private Mortgage Insurers and accepted by Wachovia through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

150.    Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Wachovia RE under carefully crafted reinsurance contracts as hereinabove described.

151.    These ceded premiums: (a) were not for services actually furnished or performed and/or (b) exceeded the value of such services.

152.    The millions of dollars paid by the Defendant Private Mortgage Insurers and accepted by Wachovia through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between Wachovia and the Defendant Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

153.    In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave, and Wachovia accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by the Defendant Private Mortgage Insurers and accepted by Wachovia through its captive reinsurer was a portion, split or percentage of

38

1  the private mortgage insurance premiums paid by Wachovia's customers. Wachovia RE participated

2  in the scheme and served as the direct party to which the split was paid. Wachovia RE agreed to

3  provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiff and

4  the Class.

5         154.    Plaintiff and the Class were subjected to settlement services and/or business incident to

6  real estate settlement services tainted by naked kickbacks or referrals of business inherently biased by

7  Defendants' unlawful kickback scheme, which involved major providers of private mortgage

8  insurance in the United States. Wachovia's reinsurance arrangements with the Defendant Private

9  Mortgage Insurers over time affected the price, quality or other characteristics of the "referred"

10 private mortgage insurance through, among other things, inherent limits on settlement service choice

11 and competition.

12        155.    First, Plaintiff and the Class were harmed in that, as a matter of law, they were entitled

13 to purchase settlement services from providers that did not participate in unlawful kickback and/or

14 fee-splitting schemes. Congress bestowed upon Plaintiff and the Class a right to a real estate

15 settlement free from unlawful kickbacks and unearned fees and has expressly provided for private

16 enforcement of this protected right by empowering consumers to recover statutory damages from

17 offending parties without proof of an overcharge. *See* 12 U.S.C. §§ 2601, 2607(d)(2). Plaintiff

18 alleges that the Defendant Private Mortgage Insurers have given, and Wachovia has accepted,

19 unlawful kickback payments and/or an unearned portion of settlement service charges and/or service

20 charges for business incident to real estate settlement services—private mortgage insurance

21 premiums—in violation of RESPA. Defendants' scheme resulted in a limitation on both settlement

22 service choice and competition. Wachovia eliminated competition among providers of private

23 mortgage insurance by requiring its borrowers to purchase private mortgage insurance from one of

24 the Defendant Private Mortgage Insurers with whom it had an arrangement. Upon information and

25 belief, referred borrowers were allocated to one of the Private Mortgage Insurers on a rotating or

26 other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in

27 return for a referral fee. The referral fee included no evaluation of price, quality, service provided,

28 reputation, performance or any other aspect of the product provided by any of the Private Mortgage

Insurers receiving the referrals.  Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiff.  Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.  *See Carter v. Welles-Bowen Realty, Inc.,* 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

156.    Second, though not necessary to prevail on their claims, Plaintiff and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.[19]  Congress has already determined that the ***aggregate*** effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").  Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.  Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiff and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to Wachovia RE that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

157.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.  *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

---

[19]    The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge."  *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

158.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. 2607(a) and (b).  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are jointly and severally liable to Plaintiff and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

159.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiff also seeks attorneys' fees and costs of suit.

## COUNT TWO

### (COMMON-LAW RESTITUTION/UNJUST ENRICHMENT)

160.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

161.    Plaintiff has conferred a substantial benefit upon Defendants which has been appreciated by Defendants.  During the Class Period, the Defendant Private Mortgage Insurers collected and wrongfully paid to Wachovia hundreds of millions of dollars as Wachovia's unlawful split or share of the private mortgage insurance premiums paid by Plaintiff and the putative Class members.

162.    The amounts collected and ceded to Wachovia RE as purported reinsurance premiums were accepted and retained by Wachovia under circumstances such that it would be inequitable for Wachovia to retain the benefit without payment to Plaintiff and the Class.

163.    The Private Mortgage Insurers were guaranteed a steady stream of business in return for ceding portions of the premiums they received from borrowers with respect to the loans involved in Defendants' captive reinsurance scheme, and they were unjustly enriched through receipt of this guaranteed stream of business.

164.    As a result of Defendants' unjust enrichment, Plaintiff and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

165.    Further, Plaintiff and the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

A.       Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Class and Plaintiff's counsel as counsel for the Class;

B.       Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.       Awarding Plaintiff and the Class statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.       Granting Plaintiff and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.       Granting Plaintiff and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

F.       Granting Plaintiff and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

Dated: February 27, 2012                    Respectfully submitted,

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

By: *Ramzi Abadou*
Ramzi Abadou (Bar No. 222567)
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Edward W. Ciolko
Terence S. Ziegler (PA 310318)
Donna Siegel Moffa (PA 310991)
Amanda R. Trask (PA 57973)
Michelle A. Coccagna (PA 205757)
280 King of Prussia Road
Radnor, PA 19087

Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &**
**BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

***Attorneys for Plaintiffs and the Proposed Class***

1

**JURY DEMAND**

2        Plaintiffs hereby demand a trial by jury.

3    Dated: February 27, 2012

4                                **KESSLER TOPAZ**
5                                **MELTZER & CHECK, LLP**

6                                By: *Ramzi Abadou*
                                 Ramzi Abadou (Bar No. 222567)
7                                580 California Street, Suite 1750
                                 San Francisco, CA 94104
8                                Telephone:  (415) 400-3000
                                 Facsimile:  (415) 400-3001
9
                                 -and-
10
                                 Edward W. Ciolko
11                               Terence S. Ziegler (PA 310318)
                                 Donna Siegel Moffa (PA 310991)
12                               Amanda R. Trask (PA 57973)
                                 Michelle A. Coccagna (PA 205757)
13                               280 King of Prussia Road
                                 Radnor, PA  19087
14                               Telephone: (610) 667-7706
                                 Facsimile: (610) 667-7056
15

16                               **BRAMSON PLUTZIK MAHLER &**
                                 **BIRKHAEUSER LLP**
17                               Alan R. Plutzik
                                 2125 Oak Grove Boulevard, Ste. 120
18                               Walnut Creek, California 94598
                                 Telephone: (925) 945-0200
19

20                               **BERKE, BERKE & BERKE**
                                 Andrew L. Berke
21                               420 Frazier Avenue
                                 Chattanooga, Tennessee 37402
22                               Telephone: (423) 266-5171

23
                                 *Attorneys for Plaintiffs and the Proposed Class*
24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28